UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                          :

KELBY FREDERICK,                          :

                            Plaintiff,    :

                                      :            11 Civ. 469 (JPO)

                -against-           :

                                      :          MEMORANDUM AND

NEW YORK CITY et al.,               :               ORDER

                            Defendants.  :

                                      :
---------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

      Presently before the Court is Plaintiff's motion to unseal selected grand jury minutes.

For the reasons that follow, the Court reserves judgment on Plaintiff's motion and orders the

District Attorney of Queens County to submit the entire grand jury record from the criminal

action underlying this 42 U.S.C. § 1983 suit to this Court for *in camera* review.

## I.      Background[1]

      This case began with a drive-by shooting in Queens on October 9, 2009.  As his fifteen–

year-old brother (A.C.) looked on through a screen door and wrought iron gate, twenty-one-year-

old Anthony Clarke was struck by a bullet in his left thigh while sitting on the front porch of his

family's house.  Only a few minutes later, defendant-detectives Lobel and McDermott arrived on

the scene.  After Anthony was rushed to the hospital, Lobel and McDermott spoke with his

brother.  According to Lobel's subsequent testimony, A.C. indicated that he had been looking

---

[1] These facts are taken from the Plaintiff's Memorandum In Support Of Motion Pursuant To CPL 190.25 (4) to Unseal Selected Portions Of The Grand Jury Minutes In A Matter Adjudicated Before The Queens Criminal Court As *People v. Fredrick*, Indictment # 2840/2009 (Dkt. No. 26); Defendants City Of New York, Mark Lobel, And Suzanne Mcdermott's Memorandum In Opposition To Plaintiff's Motion To Access Grand Jury Minutes (Dkt. No. 32); and the Affirmation in Opposition to Petitioner's Motion to Unseal Grand Jury Minutes filed by John McGoldrick, Assistant District Attorney for the County of Queens (Dkt No. 31), along with all exhibits attached thereto.  The background contained herein is limited to facts that bear on the legal question presently at issue.

outside when the attack occurred, described the hostile vehicle as a dark-colored car that contained two black men, and explained that the driver of the car leaned back while the passenger fired numerous rounds from a handgun.  Anthony later echoed that the drive-by involved two black men, though he could not make any identifications.

On October 10, 2009, Detective Lobel generated a photo array and showed it to A.C. and Anthony.  Anthony did not make any identifications.  A.C., under circumstances that the parties hotly dispute, identified Plaintiff Kelby Frederick as the driver of the vehicle.  Two weeks later, Anthony and A.C. viewed a lineup.  A.C. again identified Plaintiff, though the parties dispute the basis for this identification.  Detective Lobel later testified that he included Plaintiff in the photo array because of an unreported, anonymous phone call, the existence and circumstances of which the parties dispute; the Court need not resolve that particular disagreement just yet.

Plaintiff was arrested on October 22, 2009 for Attempted Murder in the Second Degree and other related charges.  These allegations hinged on the theory that Plaintiff had been the driver of the hostile, dark-colored vehicle involved in the October 9, 2009 shooting.  In the felony complaint, Detective Lobel alleged that Plaintiff had driven a gray Hyundai Tiburon from which another, unknown individual fired the shots that hit Anthony.

The criminal case was presented to a grand jury in Queens County starting on December 4, 2009.  A.C. testified before the grand jury.  Other witnesses may also have testified, though without the grand jury minutes, it is impossible to ascertain what happened at this proceeding.

With criminal charges against Plaintiff pending, an investigator working for Plaintiff's criminal defense attorney interviewed A.C. on June 8, 2010.  In this recorded interview, A.C. unequivocally answered "no" when asked "did [the police] suggest who it was, did they give you any suggestions?"  But, in contrast to his earlier testimony that Plaintiff was the driver, A.C. also

2

explained that "I didn't really pay attention to the driver" and responded "yes" when asked if he had identified "the shooter and not the driver." For unknown reasons, Plaintiff's defense counsel did not reveal this statement to prosecutors until November 1, 2010.

Three days later, on November 4, 2010, the criminal charges against Plaintiff were dismissed by the People in the interest of justice and the case was sealed.[2] Evidence before the Court suggests that other evidence compiled while those charges were pending – including ballistics evidence and DNA from the stolen grey Hyundai – also did not support the People's theory of the case. Although the District Attorney ("DA") emphasizes that a decision to dismiss charges is not the equivalent of a finding of actual innocence, the DA has not adduced any additional information tending to suggest Plaintiff's actual guilt of the charged offenses.

Plaintiff was imprisoned for over a year, from October 22, 2009 through November 4, 2010. Throughout this term of confinement, he suffered the looming threat of serious felony charges. He also endured substantial costs and personal inconveniences.

After Plaintiff's release, an investigator working for Plaintiff once again discussed with A.C. the circumstances surrounding his photo array identification on October 10, 2009. Dated December 11, 2010, these statements suggest that detectives Lobel and McDermott influenced A.C.'s identification of Plaintiff. In A.C.'s own words:

> When I first viewed the photoarray I told the police "I think #4 is the person but I am not sure." The police then told me that #4 was the person they suspected was involved. I then viewed the photos again and because the police suspected #4 that caused me to then identify #4. When I viewed the lineup I recognize #2 as the person from the photo so I identified him. At the lineup I was not initially sure so I asked the people to turn so I could see the left side of their face. Once I saw the left side of the face I said thats the person since I recalled the photograph.

---

[2] This date is taken from Judge Camacho's opinion denying Plaintiff's request to unseal the disputed grand jury minutes. Whereas Judge Camacho reports that the DA dismissed all charges on November 4, 2010, Plaintiff and Defendant refer to November 1, 2010 as the date on which Plaintiff was released from jail and on which charges were dismissed. The precise date is of no significance to the Court's legal conclusions.

A.C.'s parents, who were present at the photo array identification, also signed a statement on December 11, 2010 in which they confirm his more recent account.

On January 1, 2011, Plaintiff commenced this § 1983 civil rights action alleging, *inter alia*, malicious prosecution. On March 9, 2012, the Court granted Plaintiff's request for an order allowing him access to grand jury minutes from the underlying criminal action. The Court subsequently stayed its March 9, 2012 order in response to an objection filed on April 2, 2012 by the Queens DA. At an April 10, 2012 conference, the Court held that it would not compel disclosure of the grand jury minutes until Plaintiff first sought an order to that effect in state court. Plaintiff filed such a request the next day; this request was subsequently denied on May 18, 2012 by Judge Fernando Camacho of the Queens County Supreme Court, Criminal Term. Plaintiff then filed the instant motion on June 8, 2012, requesting that the Court order the unsealing of grand jury minutes from A.C.'s testimony.

## II.    Discussion

The present motion requires the Court to determine whether Plaintiff has met the legal standard for ordering the unsealing of grand jury testimony in the underlying criminal proceeding. Before turning to that legal standard, however, it is necessary to address a threshold question involving a recent Supreme Court decision.

### A.  The Significance of *Rehberg v. Paulk*

Appearing in this case to oppose Plaintiff's request, the DA invokes the Supreme Court's recent opinion in *Rehberg v. Paulk*, 132 S. Ct. 1497 (2012), as the beginning and the end of the analysis, categorically foreclosing the relief sought by Plaintiff here. If the DA's position were correct — and *Rehberg* barred the use of grand jury witness testimony in a malicious prosecution

suit brought under § 1983 — then Plaintiff could not establish a particularized need to unseal
A.C.'s grand jury records. Accordingly, the DA's argument is addressed at the outset.

In *Rehberg*, a unanimous Court held that grand jury witnesses enjoy absolute immunity
from § 1983 liability based on their testimony. *Id.* at 1505-06. It also declined to recognize
exceptions for complaining witnesses or law enforcement witnesses. *Id.* at 1507-09.

To preempt exceptions that could swallow its rule, the Court noted that this grant of
immunity "may not be circumvented by claiming that a grand jury witness conspired to present
false testimony, or by using evidence of the witness' testimony to support any other § 1983 claim
concerning the initiation or maintenance of a prosecution." *Id.* Without such a corollary to its
main holding, *Rehberg* would soon become a nullity, since "a criminal defendant turned civil
plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune
actions themselves." *Id.* (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 283 (1993) (Kennedy, J.,
concurring in part and dissenting in part)). This context is critical to an understanding of the
specific language with which the Court expounded and protected its new rule. *Cf. Food & Drug
Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning – or
ambiguity – of certain words or phrases may only become evident when placed in context.").

That very language rests at the heart of the DA's argument, which fixates on the final
clause of the *Rehberg* corollary: a ban on "using evidence of the [grand jury] witness' testimony
to support any other § 1983 claim concerning the initiation or maintenance of a prosecution."

At first glance, this language appears to support the DA's position that *Rehberg* –
whether intentionally or inadvertently – precludes the introduction of any grand jury testimony
as evidence in a § 1983 malicious prosecution claim. Yet the apparent incongruity between such
a sweeping prohibition and the traditionally narrow compass of absolute immunity doctrine

5

suggests the need for a closer look. *See Burns v. Reed*, 500 U.S. 478, 487 (1991) ("[W]e have been quite sparing in our recognition of absolute immunity and have refused to extend it any further than its justification would warrant." (citations omitted)). So does the oddity of locating this doctrinal innovation in a corollary whose stated purpose is to protect grand jury witness immunity. The question is thus whether *Rehberg*'s reference to "any other § 1983 claim" refers to *any claim at all* – or, as Plaintiff urges, to *any claim against the witness who testified*.

This is almost, but not quite, a question of first impression. The DA offers four citations to support his claim. Three of these cases, however, are inapposite, since they do not address circumstances where a witness *other* than the § 1983 defendant, and with whom the defendant had *not* conspired, offered the disputed grand jury testimony. *See Maldonado v. City of New York*, 11 Civ. 3514, 2012 WL 2359836 at *4-5 (S.D.N.Y. June 21, 2012) (refusing to revisit state law decision denying request to unseal grand jury testimony by defendant for purposes of a pendant state law malicious prosecution claim where plaintiff conceded that *Rehberg* barred his federal claim); Order of May 14, 2012, *Vasquez v. The City of New York*, 11 Civ. 3024 (Dkt. No. 31, Ex. 4) (refusing to unseal grand jury testimony of the § 1983 defendant in a malicious prosecution suit); *Jackson v. Seewald*, 11 Civ. 5826, 2012 U.S. Dist. LEXIS 62472 (May 3, 2012) (noting that *Rehberg* likely dooms a § 1983 claim premised on allegations of false grand jury testimony by defendants and conspiracy to present such testimony). Only *Bonelli v. City of New York*, 11 Civ. 0395, 2012 U.S. Dist. LEXIS 63337 (May 4, 2012), directly supports the DA's position, specifically Judge Orenstein's conclusion that *Rehberg*'s "bright-line holding . . . appears to undermine any claim that seeks to impose liability on a defendant on the basis of a person's false testimony before a [grand] jury." *Id.* at *5. Yet even in that case, Judge Orenstein added a note of understandable caution: "I recognize, however, that I may have . . .

misconstrued *Rehberg* – a recent decision that has thus far been cited in only a handful of cases, none of which addressed the issue presented here . . . ."  *Id.* at *7.

Upon careful review of the opinion, this Court holds that *Rehberg* does not create a categorical bar to the use of grand jury testimony as evidence against defendants in malicious prosecution suits brought pursuant to § 1983.  Rather, where *Rehberg* bans "using evidence of the witness' testimony to support any other §1983 claim concerning the initiation or maintenance of a prosecution," that decision prohibits only the use of a witness's own grand jury testimony against that witness if he or she subsequently becomes a § 1983 defendant.

This conclusion follows from the reasoning of *Rehberg*, but also has roots in *Briscoe v. LaHue*, 460 U.S. 325 (1983), the main precedent relied upon by Justice Alito in *Rehberg*. *Briscoe* held that police officers enjoy absolute immunity under § 1983 for their testimony as trial witnesses.  To justify that holding, Justice Stevens introduced a two-part account of why lay witnesses enjoy absolute immunity.  First, he noted that "when a private party gives testimony in open court in a criminal trial, that act is not performed 'under color of law.'"  *Id.* at 329-30. Second, he invoked a common law tradition of immunity that aims to protect against two forms of self-censorship: failure to come forward and the distortion of testimony to avoid liability.  *Id.* at 332-34.  With lay witness immunity settled, Justice Stevens turned to the next building block in his analysis – absolute immunity for trial testimony by state actors.  Deploying a hybrid functional-historical argument, he explained that § 1983 provides absolute immunity to "judges, prosecutors, and other persons acting 'under color of law' who perform official functions in the judicial process."  *Id.* at 334.  This immunity follows from "the nature of the judicial proceeding[,]" specifically the need to "assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation."  *Id.* at 334-35.  With these

7

premises established, Justice Stevens turned to his bottom line: whether they are understood as lay witnesses or as officials with a critical function in judicial proceedings (and surely they fall into one or the other of these categories), police officers are imbued with absolute immunity under § 1983. *Id.* at 335-36. Justice Stevens concluded the opinion by dispatching with policy arguments that purport to distinguish police, adding that police exceptionalism actually cuts in favor of immunity. After all, because police testify with great frequency and otherwise perform important public duties, time spent on vexatious § 1983 litigation would uniquely burden "the judicial system and [] law-enforcement resources." *Id.* at 343; *see also id.* at 341-46.

In many respects, *Rehberg* merely extended *Briscoe*'s policy reasoning. *See Vidro v. United States*, 11 Civ. 1399, 2012 WL 4481719 at *2 (D. Conn. Sept. 26, 2012) ("The *Rehberg* decision broke no new ground; it extended existing immunity for trial witnesses to witnesses testifying before a grand jury."). Rather than offer independent historical analysis of grand juror immunity to support its result, the Court simply noted that its functionalist interpretation of § 1983 can sweep more broadly than common law and that "the factors that justify absolute immunity for trial witnesses apply with equal force to grand jury witnesses." 132 S. Ct. at 1505. "In both contexts, a witness' fear of retaliatory litigation may deprive the tribunal of critical evidence. And in neither context is the deterrent of potential civil liability needed to prevent perjurious testimony." *Id. Rehberg* also relied almost exclusively on *Briscoe* to reject a proposed law enforcement exception. *See id.* at 1506 (quoting at length from *Briscoe* and explaining that "for these reasons, we conclude that grand jury witnesses should enjoy the same immunity as witnesses at trial").

This background helps to clarify *Rehberg*'s apparent ambiguity. *Briscoe* and *Rehberg* both presuppose that immunity inheres in the act of testifying. Neither opinion indicates any

concern with third parties against whom such evidence is admitted; rather, both attend exclusively to the testifying witness and the incentives that may lead him or her to self-censor. For lay witnesses, *Briscoe* explains that § 1983 immunity should be extended for two reasons: (1) action outside color of law and (2) preventing self-censorship.  For police witnesses, *Briscoe* explains (and *Rehberg* echoes) that either of two immunity-conferring views can be adopted: (1) the officer "may be regarded as an official performing a critical role in the judicial process" or (2) the officer "may reasonably be viewed as acting like any other [lay] witness sworn to tell the truth."  *Id.* at 336.

The weakness or irrelevance of these rationales when applied to an interpretation of *Rehberg* that precludes the use of *any* grand jury evidence against *any* § 1983 defendant (or even solely defendants in § 1983 suits involving the initiation or maintenance of a prosecution) reveals where the DA errs.  *Briscoe*'s first account of lay witness immunity – action outside the color of law – focuses on who can be sued under § 1983, not what evidence can be used in such cases. Similarly, *Briscoe*'s first account of police witness immunity – official function in the judicial process – is also irrelevant, since it does not address what kinds of evidence may be used against police officers when they are sued under § 1983, nor does it create some kind of "immunity" that prevents their grand jury testimony from being used against third parties.  Rather, it merely limits absolute immunity to scenarios in which police act judicially, leaving police clothed in qualified immunity for ordinary law enforcement tasks and saying nothing at all about what sorts of grand jury evidence can be admitted against them.  This is a straightforward application of the Court's functional approach to immunity analysis.  *See, e.g.*, *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (describing and applying functional analysis); *Burns*, 500 U.S. at 486 (same).

This leaves only the self-censorship rationale outlined in *Briscoe* and embraced by *Rehberg*. It makes sense to fear self-censorship while deciding whether to let plaintiffs sue witnesses. But that sense becomes nonsense when the question is whether witnesses might self-censor out of fear that their testimony may be used against another person. Grand jury witnesses should *expect* that their testimony may well be used against a third party at a trial – whether the criminal suspect under investigation or someone else entirely. If that happens, their grand jury testimony may also come into play; indeed, prosecutors regularly turn over portions of grand jury testimony to criminal defendants pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500. For that reason, it is hard to imagine that grand jury witnesses would be less likely to provide testimony, or more likely to distort it, simply because their words might be used against another person. This is even more obviously the case when we turn to the decidedly unlikely specter of self-censorship resulting from fear that grand jury statements may ultimately be used against other people in a civil suit arising years later from misconduct in the original criminal case. Indeed, given that grand jury witnesses naturally expect that their testimony may affect third parties, and that witnesses often testify without full knowledge of what legal implications may follow from their statements, a bar on the use of such testimony against *other* people in a subset of § 1983 cases is hardly necessary to secure the policy goals that underlie *Rehberg*'s rule of grand jury witness immunity.

To recall the context of this analysis: the Court is interpreting language that the Supreme Court described as absolutely necessary to effectuate grand jury witness immunity. In light of that context, the DA's broad reading of the Court's corollary must be supported by more than the mere potential for witness self-censorship. It must be based on a conclusion that without such a broad reading, *Rehberg*'s primary holding would be frustrated.

Such a conclusion cannot be made.  Even if the rare unsealing of grand jury testimony for related § 1983 litigation may produce marginal self-censorship effects, courts are more than capable of accounting for those considerations within the context of the formidable showing prerequisite to a successful request to unseal, which recognizes potent interests in grand jury secrecy.  This conclusion is dispositive, since the disputed language from *Rehberg* must be understood in light of its role as a protective corollary of *Rehberg*'s holding.  Thus, this Court holds that *Rehberg*'s ban on "using evidence of the witness' testimony to support any other §1983 claim concerning the initiation or maintenance of a prosecution" refers only the use of witnesses' own grand jury testimony against them if they subsequently appear as a § 1983 defendant.[3]

### B.  Plaintiff's Request to Unseal the Grand Jury Records

The law governing disclosure of state grand jury proceedings attempts a delicate balance among competing interests in justice, comity, and secrecy.  Rule 6(e)(3)(E)(i) of the Federal Rules of Criminal Procedure provides that a court "may authorize disclosure–at a time, in a manner, and subject to any other conditions that it directs–of a grand-jury matter . . . preliminarily to or in connection with a judicial proceeding."  The Supreme Court has fashioned a tripartite analysis to guide lower courts, explaining that "[p]arties seeking grand jury transcripts

---

[3] One possible rejoinder might be that this interpretation treats the corollary, which governs cases where the witness's testimony is used to "support any other §1983 claim concerning the initiation or maintenance of a prosecution," as a nullity, since the underlying rule already immunizes grand jury witnesses from "any §1983 claim based on the witness' testimony."  But ultimately this rejection fails, as it misses a critical distinction in the Court's language.  Whereas the primary rule covers § 1983 claims based on grand jury testimony itself, for instance a suit against a complaining witness for grand jury perjury, the corollary covers the related, but only partly coextensive, class of § 1983 claims against a defendant concerning the initiation or maintenance of a prosecution that may as an evidentiary matter encompass their grand jury testimony without being grounded on the substance of that testimony.  Thus, both the rule and corollary retain independent legal effect.  The Court also notes that the full scope of this language – "concerning the initiation of a prosecution" – remains unsettled.  *See, e.g.*, *Hewitt v. City of New York*, 09 Civ. 214, 2012 WL 4503277 at *6 n.8 (E.D.N.Y. Sept. 28, 2012) ("It is unclear whether a Section 1983 claim arising out of an arrest, such as false arrest, excessive use of force, or illegal search and seizure, could be considered a claim 'concerning the initiation ... of a prosecution' under *Rehberg*" (citation omitted)).

under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979). In other words, to unseal grand jury records the parties must prove a "particularized need." *U. S. v. Procter & Gamble Co.*, 356 U.S. 677, 683 (1958). Leavened by principles of comity, this framework also applies to cases in which a party seeks to pierce the secrecy of state grand jury proceedings. *See Myers v. Phillips*, 04 Civ 4365, 2007 WL 2276388 at *2 (E.D.N.Y. Aug. 7, 2007) ("In evaluating applications to unseal state grand jury minutes, federal courts have required the same demonstrations of 'particularized need' required for the unsealing of federal grand jury minutes."). Courts have repeatedly recognized that "the showing required is substantial." *Alvarado v. City of New York*, 04 Civ 2558, 2006 WL 2252511 at *2 (E.D.N.Y. Aug. 5, 2006) *objections overruled*, 04 Civ 2558, 2009 WL 510813 (E.D.N.Y. Feb. 27, 2009).

As often occurs when important values stand in context-sensitive tension, the Court painted its preferred balance with rough brushstrokes. District courts accordingly must exercise substantial discretion as they apply *Douglas Oil* to the facts of each case. *See In re Petition of Craig*, 131 F.3d 99, 104 (2d Cir. 1997) ("The discretion of a trial court in deciding whether to make public the ordinarily secret proceedings of a grand jury investigation is one of the broadest and most sensitive exercises of careful judgment that a trial judge can make.").

The Court holds that on the basis of available facts, Plaintiff states a compelling interest in avoiding a possible injustice and that Plaintiff's need for disclosure trumps admittedly weighty concerns of secrecy and comity. Rather than order immediate disclosure, however, the Court

concludes that the *Douglas Oil* requirement of narrowly structured disclosure is best satisfied on these unusual facts by *in camera* review of the whole grand jury record.

### 1.  Avoiding Injustice[4]

#### a.  Legal Standard

"The typical showing of particularized need arises when a litigant seeks to use 'the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like.'"  *Douglas Oil*, 441 U.S. at 237 n.12 (quoting *Proctor & Gamble*, 356 U.S. at 683). In each of these contexts, denial of access to grand jury minutes can result in "possible injustice" if the rights of parties are effectively destroyed by inability to view key evidence.  Malicious prosecution cases are no exception to the rule that the interests of justice may be thwarted by refusal to unseal grand jury minutes.  *See, e.g.*, *Palmer v. Estate of Stuart*, 02 Civ 4076, 2004 WL 2429806 at *3 (S.D.N.Y. Nov. 1, 2004) ("With respect to the need to avoid a 'possible injustice' Palmer has made a compelling case that the grand jury testimony may be necessary to the prosecution of this [malicious prosecution] case.").  Indeed, two interests of justice are potentially implicated by § 1983 malicious prosecution cases: denial of compensation to victims of official misconduct and a weakening of society's shared regulatory interest in deterring constitutional violations.  *See Hardin v. Straub*, 490 U.S. 536, 539 (1989) (describing "§ 1983's chief goals of compensation and deterrence").  Thus, the *Douglas Oil* "particularized interest" requirement can sometimes be satisfied where a civil rights claim for malicious prosecution would be thwarted by denial of access to sealed grand jury minutes.

---

[4] For purposes of this discussion, Plaintiff's state and federal claims are treated identically.  *See Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003) ("[T]he elements of false arrest and malicious prosecution under § 1983 are 'substantially the same' as the elements under New York law . . . .  [T]he analysis of the state and the federal claims is identical." (internal citation omitted)).

Of course, the fact that some malicious prosecution plaintiffs may require grand jury minutes does not mean that courts should therefore grant requests to unseal on anything approximating a regular basis.  Malicious prosecution claims are bountiful; decisions to unseal grand jury records are rare.  "Authorizing a fishing expedition based solely on conclusory allegations of misconduct before the grand jury would result in every plaintiff who claimed malicious prosecution being given access to the minutes of the grand jury that voted on the underlying indictment . . . [which] would defeat the purpose behind the particularized need test, and cannot be correct."  *Alvarado*, 2009 WL 510813 at *2 (E.D.N.Y. Feb. 27, 2009).

This difficulty is exacerbated by the fact that in certain circumstances, Second Circuit doctrine can make access to grand jury minutes a virtual prerequisite to a successful malicious prosecution claim.  In such cases, motions to unseal may become standard practice.

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law."  *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (citations omitted).  In New York, "[t]o succeed on a claim for malicious prosecution, the plaintiff must show that a prosecution was initiated against him, that it was brought with malice but without probable cause to believe that it could succeed and that the prosecution terminated in favor of the accused plaintiff."  *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).  "Probable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty."  *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983).

Grand jury indictments create a rebuttable presumption of probable cause "founded upon the premise that the Grand Jury acts judicially."  *Id.*  To rebut this presumption, which is fatal to

a malicious prosecution case if unrefuted, plaintiffs must adduce "evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Id.* at 82-83.

The Second Circuit has interpreted this requirement strictly.  In *Rothstein v. Carriere*, the court found that a plaintiff had not rebutted the presumption of probable cause merely by showing that that the defendant, whom he accused of malicious prosecution by means of perjury, had testified before the grand jury.  373 F.3d 275, 284 (2d Cir. 2004).  Rather, "[t]he burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially.'"  *Id.* (quoting *Colon*, 60 N.Y.2d at 82).  Because "the content of [defendant's] grand jury testimony is unknown, as is the content of the rest of the government's presentation," and because "[plaintiff's] counsel conceded that he had no idea what happened before the grand jury," the court concluded that only "rank speculation" would support a finding that the defendant "must have testified falsely to the grand jury." *Id.*[5]

*Rothstein* sets a high bar for malicious prosecution claims in cases where a grand jury issued an indictment.  In effect, it requires plaintiffs to prove what happened before the grand jury to negate probable cause.   Plaintiffs may do so by deposing grand jury witnesses, though only where they can access witnesses and where witnesses accurately recall their testimony. *Compare Cherry v. Rodenburg*, 04 Civ. 1902, 2008 WL 4610302 at *4 (E.D.N.Y. Oct. 15, 2008)

---

[5] Of course, the particular type of § 1983 lawsuit at issue in *Rothstein* is now expressly barred by *Rehberg*, since an officer who offers perjured testimony before a grand jury would still receive absolute immunity against any § 1983 litigation based on that act of perjury.

(denying motion to unseal grand jury minutes and noting that New York law allows grand jury witnesses to disclose their own testimony) *with Palmer*, 2004 WL 2429806 at *3 (S.D.N.Y. Nov. 1, 2004) ("[T]his Court cannot agree that Palmer has failed to show that interviews, depositions, subpoenas and trial testimony would not provide other means of obtaining the substance of the grand jury testimony.  It is highly unlikely that the surviving officers in 2004 could recall precisely what they said before the grand jury in 1999, at the time the matter was freshest in their minds." (internal citation omitted)).  There may also be cases where plaintiffs have already come into possession of grand jury minutes in the underlying criminal proceeding.  A third route, presently at issue, is a motion to unseal a specific portion of the minutes – or, in light of *Rothstein*'s emphasis on the need for plaintiffs to address "the rest of the government's presentation," 373 F.3d at 284, the whole grand jury record.

In this third class – cases with grand jury indictments where the minutes have not been disclosed and where deposition of grand jury witnesses will not suffice – plaintiffs must move to unseal to have any chance of negating the presumption of probable cause.  Granting all of these motions would trammel grand jury secrecy, but denying all of them would undoubtedly create a potential for injustice in some meritorious § 1983 suits.  Courts have responded by striking a balance within the analysis of the first *Douglas Oil* requirement of avoiding "possible injustice."

Specifically, courts have treated a showing of likely success in defeating the presumption of probable cause as a precondition of access to grand jury minutes.  *Compare U.S. v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990), *abrogated on other grounds by U.S. v. Marcus*, 628 F.3d 36 (2d. Cir. 2010) ("A review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct."), *and Brown v. City of New York*, 06 Civ. 2059, 2007 WL 415080 at *2 (S.D.N.Y. Jan. 30, 2007) ("[W]here a request is made to unseal a transcript of

16

the minutes generated during a grand jury proceeding(s), solely to rebut the presumption of

probable cause that attaches when a person is indicted on criminal charges, the particularized

need standard has not been met."), *with Palmer*, 2004 WL 2429806 at *3 (S.D.N.Y. Nov. 1,

2004) (describing a "compelling case" for unsealing and noting that "[a] dramatic change in the

probable cause findings is a sufficient circumstance to suggest that there is a 'possible' injustice

if [plaintiff] is unable to examine" grand jury minutes), *and Scheiner v. Wallace*, 93 Civ. 0062,

1995 WL 753931 at *8 , *10 (S.D.N.Y. Dec. 19, 1995) (authorizing *in camera* review of grand

jury testimony to "prevent an injustice from being done" in a malicious prosecution case where

discrepancies had emerged regarding a key witness's grand jury testimony).  Chief Judge Preska

has described an analogous form of analysis in the context of summary judgment motions where

the probable cause element is in dispute:

> [W]here a plaintiff's only evidence to rebut the presumption of the indictment is
> his version of events, courts will find such evidence to be nothing more than mere
> conjecture and surmise that [the plaintiff's] indictment was procured as a result of
> conduct undertaken by the defendants in bad faith, which is insufficient to rebut
> the presumption of probable cause . . . However, where, as here, the Court is
> presented with more than just the plaintiff's version of events, a question of fact
> may exist as to the propriety of the grand jury indictment.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 273 (S.D.N.Y. 2010) (internal citations

omitted); *see also id.* (explaining that *Boyd* created a "'competing testimony plus' standard to

assess whether a plaintiff sufficiently has rebutted the presumption of probable cause").

In malicious prosecution cases, courts have thus recognized an interest in avoiding

"possible injustice" under *Douglas Oil* where plaintiffs adduce facts that strongly suggest

misconduct at the grand jury sufficient to rebut the presumption of probable cause if ultimately

proven true.  This approach strikes a reasoned balance between competing interests and allows

plaintiffs facing a plausible threat of injustice to survive *Rothstein*'s razor.

17

### b.  Application of Law to Facts

Refusal to unseal the grand jury minutes in this case would create a hazard of "possible injustice."  Plaintiff alleges that detectives Lobel and McDermott improperly influenced A.C. to identify him in the photo array and at the line up.  He supports his allegation with affidavits from A.C. and A.C.'s parents that corroborate this account.  These affidavits are more recent than other record evidence that contradicts Plaintiff's allegations.  Further, if true, the actions allegedly taken by detectives Lobel and McDermott may constitute "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith."  *Colon*, 60 N.Y.2d at 83.[6]  Thus, Plaintiff has adduced and corroborated facts that strongly suggest misconduct at the grand jury sufficient to defeat the presumption of probable cause for purposes of his malicious prosecution claim.  For that reason, denying Plaintiff access to evidence critical to an evaluation of what happened at the grand jury – which could doom his case under *Rothstein* – would create a potential for injustice.  Plaintiff can thus satisfy the first *Douglas Oil* requirement.[7]

Defendants argue that none of this analysis is necessary because the parties can simply depose A.C. about his grand jury testimony.  While depositions of witnesses may ordinarily suffice to illuminate grand jury proceedings and thereby obviate motions to unseal, *see, e.g.*, *Barnett v. Dillon*, 890 F. Supp. 83, 88 (N.D.N.Y. 1995), that general rule does not apply where the key witness has offered contradictory accounts.  *See Palmer*, 2004 WL 2429806 at *3 (finding depositions inadequate as a substitute for grand jury minutes and noting that "[i]t is highly unlikely that the surviving officers in 2004 could recall precisely what they said before

---

[6] The Court reserves final judgment on the question whether these actions, even if true, would constitute misconduct sufficient to undo the presumption of probable cause that follows from the grand jury indictment.

[7] Nonetheless, even if Plaintiff can prove misconduct at the grand jury involving A.C.'s testimony, it is possible that the presumption of probable cause may stand unrefuted by virtue of the rest of the government's presentation.  *See Rothstein*, 373 F.3d 275, 284.  Plaintiff, however, has requested only that the Court unseal grand jury minutes from A.C.'s testimony.

the grand jury in 1999, at the time the matter was freshest in their minds").  Here, A.C. was a

minor at the time of the events in question, these events occurred almost three years ago, and

A.C. has since made contradictory statements about whether detectives Lobel and McDermott

influenced his identification of Plaintiff during the photo array.  If there were ever a case where a

deposition of the witness could not conclusively settle what that witness told the grand jury, this

is it.  *Cf. Velasquez v. City of New York,* 97 Civ. 1647, 1997 WL 736698 at [*]1 (S.D.N.Y. Nov.

28, 1997) ("[Courts] have repeatedly declined to permit disclosure of grand jury material without

a showing of a witness's inability to remember events at a subsequent proceeding or actual

inconsistencies between the grand jury testimony and subsequent testimony.").

### 2.  Comity

It is well settled that "[a] strong policy of comity between state and federal sovereignties

impels federal courts to recognize state privileges where this can be accomplished at no

substantial cost to substantive and procedural policy."  *Wilson v. City of New York*, 06 Civ. 229,

2007 WL 4565138 at *1 (E.D.N.Y. Dec. 21, 2007) (quoting *Lora v. Board of Ed. of City of New

York*, 74 F.R.D. 565, 576 (E.D.N.Y. 1977)).  It is equally well settled, however, that a federal

court is "not bound by state law protecting the secrecy of state grand jury proceedings."  *Cherry

v. Rodenburg*, 04 Civ. 1902, 2008 WL 4610302 at *2 (E.D.N.Y. Oct. 15, 2008).  Rather, in cases

where a state court denies access to grand jury transcripts, "the burden falls on this Court to

make an independent determination of whether the grand jury transcripts should be released."

*Palmer*, 2004 WL 2429806 at *2 (S.D.N.Y. Nov. 1, 2004); *see also King v. Conde*, 121 F.R.D.

180, 187 (E.D.N.Y. 1988) ("New York state law does not govern discoverability and

confidentiality in federal civil rights actions . . . . Simple direct application of the state rule

would be undesirable and improper.  It would often frustrate the important federal interests in

broad discovery and truth-seeking and the interest in vindicating important federal substantive policy such as that embodied in section 1983.").

In this case, the Court recognized the importance of comity by staying its March 9, 2012 order and requiring Plaintiff to first file his request in state court.  This decision accorded with the general rule that "requests for disclosure of grand jury transcripts should be directed to the court that supervised the grand jury's activities."  *See Restivo v. Nassau County*, 06 Civ 6720, 2008 WL 2938009 at *2 (E.D.N.Y. July 28, 2008).

Judge Camacho of the New York Supreme Court, Queens County, denied Plaintiff's request to unseal.  He offered several grounds for this conclusion: (1) Plaintiff could rely on A.C.'s  December 11, 2011 affidavit to rebut the presumption of probable cause by showing misconduct at the grand jury; (2) Plaintiff has "failed to state with any specificity what testimony he expects will be revealed by release of the transcript, and relies only on speculation"; and (3) "The presumption of confidentiality surrounding grand jury proceedings cannot be overcome by conclusory allegations that release of the transcripts is necessary."  Finding no compelling or particularized interest, Judge Camacho did not reach the question whether a need for continued secrecy outweighs the public interest in unsealing these grand jury minutes.

For reasons stated *supra* and *infra*, the Court respectfully disagrees with Judge Camacho and concludes that comity does not require acceptance of his conclusions.  *See Socialist Workers Party v. Grubisic,* 619 F.2d 641, 644 (7th Cir. 1980) (noting that a federal policy of requiring that "plaintiffs first seek disclosure through the avenues available to them in the state court does not give the state courts a veto over disclosure in [a] federal civil rights case").

### 3.   The Need for Continued Secrecy

The critically important secrecy of grand jury proceedings weighs heavily against any request to unseal grand jury records.  *See, e.g.*, *Rehberg v. Paulk*, 132 S. Ct. 1497, 1509 (2012) ("We consistently have recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." (citations omitted)).  In *U. S. v. Procter & Gamble Co.*, the Supreme Court identified five objectives served by grand jury secrecy:

> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

356 U.S. 677, 681 n.6 (1958).  The Court has added that "in considering the effects of disclosure on grand jury proceedings, the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries." *Douglas Oil*, 441 U.S. at 222.  And recently, in *Rehberg*, the Court reiterated in strong terms the importance of the "vital secrecy" that protects grand juries.  132 S. Ct. at 1509.

Rather than treat the need for secrecy as a free-floating value, courts customarily review whether and to what extent the purposes that justify grand jury secrecy are present in each case. *See, e.g.*, *Hewitt v. City of New York*, 09 Civ. 214, 2009 WL 2957924 at *2 (E.D.N.Y. Sept. 11, 2009) (noting that "the interests in protecting grand jury secrecy here go beyond the usual concerns articulated for protecting such proceedings").  Courts sometimes find that these purposes are barely implicated by a motion to unseal.  *See, e.g.*, *Myers*, 2007 WL 2276388 at *3

(E.D.N.Y. Aug. 7, 2007) ("It is hardly necessary to review most of these factors, as virtually none of them is even arguably applicable here . . . .").

*Palmer v. Estate of Walwyn Stuart* is instructive.  There, Palmer sued the estate of a police detective (Stuart) for false arrest and false imprisonment.  2004 WL 2429806 at *1.  In the underlying criminal action, several officers (including Stuart) had testified at a preliminary hearing where a judge found probable cause to hold Palmer in custody.  *Id.*  The grand jury, however, refused to indict after hearing evidence from Palmer and multiple officers (again including Stuart).  *Id.*  A state court refused to unseal the grand jury minutes, finding no compelling and particularized need, and finding in the alternative that interests in continued secrecy outweighed the public interest in disclosure.  *Id.* at 2.  Addressing the interest in grand jury secrecy, Judge Gorenstein explained:

> It is hardly necessary to review most of these factors as virtually none of them are even arguably applicable here.  Palmer's grand jury proceeding is over. Disclosure of the testimony will not facilitate any "escape," will not cause anyone to "importune" grand jurors as their identities will not be revealed in the minutes, will not cause any witness tampering, will not affect the incentive for witnesses to testify before future grand juries, and will not protect Palmer's name, as he has disclosed the fact that he was the subject of the grand jury investigation by the filing of this lawsuit . . . .

*Id.* at *5 (citation omitted).

So too here.  This Court need not worry about escapes.  The grand jury has completed its deliberations and the identities of its members will remain confidential even if the minutes are unsealed, so deliberative freedom and the prevention of grand juror harassment are irrelevant. For the same reason, the Court sets aside the purpose of preventing subornation of perjury and witness tampering.  Further, because Plaintiff has chosen to identify himself publicly as a former target of police investigation, the purpose of protecting an "innocent accused" is of no weight.

22

The single secrecy-related consideration that bears on the Court's analysis is a desire to "[t]o encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes." *Proctor & Gamble*, 356 U.S. at 681 n.6.  As promised in the discussion of *Rehberg* above, the Court accounts for this important self-censorship interest and recognizes that it extends beyond the present case.  *See Douglas Oil*, 441 U.S. at 222 ("Fear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties.").

Even so, the strength of this interest is undeniably diminished on these facts.  A.C. would almost certainly have testified if the criminal case against Plaintiff had proceeded to trial, thereby necessitating disclosure of his grand jury minutes.  *See Palmer*, 2004 WL 2429806 at *5 ("The Court cannot accept the argument implicit in the District Attorney's submission: that future witnesses before grand juries must be able to testify with the confidence that their testimony will never be revealed.  After all, whenever a witness testifies for the prosecution at a criminal trial, the grand jury testimony of that witness relating to the subject matter of his or her trial testimony is automatically made available to the defendant.").  Further, A.C.'s grand jury minutes would be examined years later, in a civil rather than a criminal case, and under circumstances where concerns about his safety and anonymity are virtually nonexistent.  Only in the most abstract and minimal sense might a prospective grand juror who learns of a decision to unseal A.C.'s grand jury minutes be moved to hide or shade testimony in a future criminal case.

### 4.  Narrow Structuring of the Request

The substantial discretion afforded to district courts in deciding motions to unseal grand jury minutes extends to control over the extent of any disclosure ultimately authorized.  *See Douglas Oil*, 441 U.S. at 222 (requiring district courts to ensure that requests are "structured to

23

cover only material so needed"). Here, Plaintiff requests only the grand jury minutes covering A.C.'s testimony. This is admittedly a narrowly tailored request.

Out of an abundance of caution, however, the Court concludes that it can best avoid possible injustice and protect grand jury secrecy by reviewing all of the grand jury minutes *in camera*. The context afforded by such review will assist the Court in determining the strength of interests in justice and secrecy, and will therefore ensure the proper vindication of both values.

The Court raised the possibility of *in camera* review at oral argument. Plaintiff did not object, though he reiterated his concern that he could not withstand summary judgment without a copy of the grand jury minutes. Defendant did object, expressing concern that grand jury secrecy would be harmed if judges sought *in camera* review in *every* malicious prosecution case. The DA also objected on similar grounds, adding that courts might face administrability concerns.

These concerns are well taken. But for these very reasons, the Court does not conclude that *in camera* review is *always* appropriate in malicious prosecution cases. Rather, as discussed above in reference to avoiding possible injustice, the Court concludes that unsealing grand jury minutes is appropriate only where the plaintiff can adduce facts that strongly suggest misconduct at the grand jury and where no alternative means of illuminating the grand jury proceeding exist. In such rare cases, the option of *in camera* review allows an even more refined assessment of the delicate balance between justice and secrecy and thus a more accurately calibrated determination of whether the plaintiff states a "particularized need" under *Douglas Oil*.

The wisdom of this approach is confirmed by precedent. *See, e.g.*, *In re Fed. Grand Jury Proceedings*, 760 F.2d 436, 440 (2d Cir. 1985) (noting that the government must turn over grand jury minutes to judges for *in camera* review where lawyers seek disclosure of the grand jury

testimony of witnesses against them in state disciplinary proceedings); *U.S. v. Sobotka*, 623 F.2d 764, 768 (2d Cir. 1980) ("The district court below had the obligation to assess the strength of the particularized showing of need made by the Government in view of the case law and then to make an in camera examination of the pertinent portions of the grand jury transcript.  The disclosure order must be structured to cover only the material required in the interests of justice." (citing *Douglas Oil*, 441 U.S. at 222)); *Scheiner*, 1995 WL 753931 at *1 (S.D.N.Y. Dec. 19, 1995) (holding that "[t]he District Attorney's Office will be compelled to present the [grand jury] Minutes of the testimony of McNicholas and Alizade to the Court for review *in camera*").

Upon completion of *in camera* review, the Court will issue a final decision regarding Plaintiff's request for disclosure of the grand jury minutes covering A.C.'s testimony.

III. **Conclusion**

For the foregoing reasons, the Court reserves judgment on Plaintiff's motion to unseal grand jury minutes.  The District Attorney of Queens County is directed to submit the Minutes of the grand jury proceeding against Plaintiff in the criminal action underlying this suit to the Court for review *in camera*.


SO ORDERED.


Dated: New York, New York
        October 11, 2012

_____
            J. PAUL OETKEN
        United States District Judge

25